## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **MICHAEL E. STARK, MONIKA BHUTA and FALCON PICTURE GROUP LLC**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**HEALTH CARE SERVICE CORPORATION** *dba* **BLUE CROSS AND BLUE SHIELD OF ILLINOIS and BLUE CROSS AND BLUE SHIELD ASSOCIATION,**<br><br>**Defendants.** | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**Case No. _____** |

## CLASS ACTION COMPLAINT

Plaintiffs, MICHAEL E. STARK, MONIKA BHUTA, and FALCON PICTURE GROUP, LLC, on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Health Care Service Corporation, a Mutual Legal Reserve Company, d/b/a Blue Cross Blue Shield of Illinois ("HCSC") and the Blue Cross and Blue Shield Association ("BCBSA"), allege as follows:

## NATURE OF THE CASE

1.      This is a class action brought on behalf of HCSC subscribers to enjoin an ongoing conspiracy in violation of the Sherman Act between HCSC and the thirty-seven other BCBSA member health plans.  In addition, this action seeks to recover damages in the form of inflated premiums that HCSC has charged as a result of this illegal conspiracy, and as a result of anticompetitive conduct it has taken in its illegal efforts to restrain trade and establish and maintain monopoly power throughout Illinois.

1

2.      HCSC is by far the largest health insurance company operating in Illinois and currently exercises market power in the commercial health insurance market throughout Illinois. The dominant market share enjoyed by HCSC is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with HCSC in Illinois and that HCSC will have the exclusive right to do business in Illinois so long as it refrains from competing with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including HCSC.  Through the terms of these *per se* illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including HCSC, have explicitly agreed not to compete with one another, in direct violation of Section 1 of the Sherman Act.  By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

3.      This illegal conspiracy to divide markets and to eliminate competition extends beyond the use of the Blue Cross and Blue Shield brand names.  Many of the Blue Cross and Blue Shield affiliates have developed substantial non-Blue brands that could compete in Illinois. However, the illegal conspiracy includes a *per se* illegal agreement that the Blue Cross and Blue Shield licensees will not compete with one another through the use of their non-Blue brands, beyond a relatively *de minimis* extent.  But for the illegal agreements not to compete with one another, these entities could and would use their non-Blue brands to compete with HCSC throughout Illinois, which would result in better service, greater competition and lower premiums for subscribers.

2

4.      The Defendants' illegal conspiracy has perpetuated HCSC's monopoly power in Illinois, which has resulted in skyrocketing premiums for HCSC enrollees for over a decade. HCSC's anticompetitive behavior, and the lack of competition HCSC faces because of its monopoly power and anticompetitive behavior, have led to higher costs, resulting in higher premiums charged to HCSC customers.  As a result of these inflated premiums, HCSC, doing business as Blue Cross Blue Shield of Illinois, filed for rate increases of 10.2% in 2007, 18% in 2008, and 8.4% in 2009 for some customers.

5.      As the dominant player in all of Illinois' health insurance markets, HCSC has led the way in causing premiums to be increased each year.  As a result of these and other inflated premiums, HCSC's surplus grew from $6.1 billion in 2007 to $6.7 billion in 2009, up from $4.3 billion just four years earlier in 2005.  The company's surplus is five times the minimum required for solvency protection. HCSC's premium increases have funded the soaring compensation for its executives. HCSC paid its CEO $12.9 million in 2011, a 61% raise over her 2010 compensation. HCSC's ten highest paid executives were paid an aggregate of $41.7 million in 2011 – $25.3 million more than they were paid in 2010 – yet HCSC still earned a net income of over $1 billion for the second straight year.

6.      These inflated premiums and the other described negative features of its products, would not be possible if the market for health insurance in Illinois were truly competitive.  Full and fair competition is the only answer to artificially inflated prices, and competition is not possible so long as HCSC and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting or eliminating the ability of thirty-seven of the nation's largest health insurance companies from competing in Illinois.

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBSA and HCSC for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

8.     Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

**Plaintiffs**

9.     Plaintiff MICHAEL STARK is a resident citizen of Illinois. He has been enrolled in an individual HCSC health insurance policy since April 1, 2005.

10.     Plaintiff MONIKA BHUTA is a resident citizen of Illinois. She is and has been enrolled in an individual HCSC health insurance policy.

11.     Plaintiff FALCON PICTURE GROUP, LLC is an Illinois company with its principal office located at 1051 E. Main Street, Suite 105, East Dundee, Illinois 60118. Plaintiff Falcon Picture Group LLC has purchased HCSC health insurance to cover its 5 employees since 2001.

**Defendants**

12.     Defendant BCBSA is a corporation organized under the laws of Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by the thirty-eight (38) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans.  Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.  A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

13.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

14.     BCBSA has contacts with the State of Illinois by virtue of its agreements and contacts with HCSC.  In particular, BCBSA has entered into a series of license agreements with HCSC that control the geographic areas in which HCSC can operate.  These agreements are a subject of this Complaint.

15.     Defendant HCSC is the company offering the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Illinois.  Like other Blue Cross and Blue Shield plans nationwide, HCSC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the State of Illinois.  HCSC also does business as Blue Cross Blue Shield of Oklahoma in Oklahoma, as Blue Cross Blue Shield of Texas in Texas, and as Blue Cross Blue Shield of New Mexico in New Mexico.

16.     The principal headquarters for HCSC is located at 300 E Randolph Street, Chicago, IL 60601.  HCSC does business in each county in Illinois.

## TRADE AND COMMERCE

17.     HCSC and the 37 other Blue Cross/Blue Shield companies that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.  HCSC provides commercial health insurance that covers Illinois residents when they travel across state lines, purchases health care in interstate commerce when Illinois residents require health care out of state, and receives payments from employers outside of Illinois on behalf of Illinois residents.

## CLASS ACTION ALLEGATIONS

18.     Plaintiffs bring this action seeking damages and other relief on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Illinois Class") defined as:

> All persons or entities who, from August 21, 2008 to the present (the "Class Period") have paid health insurance premiums to Health Care Service Corporation, a Mutual Legal Reserve Company, *dba* Blue Cross and Blue Shield of Illinois, for individual or small group full-service commercial health insurance.

19.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.  While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are several million Class members, the exact number and identities of which can be obtained from BCBSA and HCSC.

20.     There are questions of law or fact common to the Class, including but not limited to:

a. Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Section 1 of the Sherman Act, or are otherwise prohibited under Section 1 of the Sherman Act;

b. Whether, and the extent to which, premiums charged by HCSC to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements; and

c. Whether, and the extent to which, premiums charged by HCSC have been artificially inflated as a result of the anticompetitive practices adopted by HCSC.

21. The questions of law or fact common to the members of the Illinois Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

22. Plaintiffs are members of the Illinois Class; their claims are typical of the claims of the members of the Class; and Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs and the Illinois Class are direct purchasers of individual or small group full-service commercial health insurance from HCSC, and their interests are coincident with and not antagonistic to other members of the Class.  In addition, Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

23. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and HCSC.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which HCSC has

7

records.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### General Background and Summary of Allegations

25.     HCSC enjoys unrivaled market dominance within Illinois. As of 2010, HCSC controlled  54.1% of the Illinois market for full-service small group commercial health insurance plans, and 64.5% of the Illinois market for full-service individual health policies.  HCSC controlled 48.1% of the entire $20.7 billion Illinois market for all health, life, property and casualty insurance, vastly exceeding the 9.2% and 8.3% shares of its nearest competitors, UnitedHealth and Humana. The Illinois Plan of HCSC has 7.3 million members, who comprise over half of HCSC's total enrollment.  This 7. 3 million members, who represent over two-thirds of total membership and operating earnings, continue to be the primary driver of HCSC's earnings.

26.     HCSC's market dominance in Illinois is the result of a conspiracy between HCSC and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.  That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA.  As detailed

herein, the member health insurance plans of BCBSA, including HCSC, have entered into a series of licensing arrangements that have insulated HCSC and the other member plans from competition in each of their respective service areas.

27.     This series of agreements has enabled HCSC to acquire and maintain a grossly disproportionate market share for health insurance products in Illinois, where HCSC as a result enjoys market and monopoly power.

28.     HCSC has used its market and monopoly power in Illinois to engage in a number of anticompetitive practices.  For example, HCSC uses its market and monopoly power and its reimbursement policy to threaten providers into contracting with HCSC at below-market rates. Faced with this prospect, providers capitulate to HCSC's demands. But HCSC has not passed on its savings to subscribers. To the contrary, HCSC netted over $1 billion in 2010 and 2011, even after paying multi-million dollar bonuses to its executives. *Id.*

29.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market, HCSC faces little pressure to constrain its own costs. With few other health insurance plan options to compete with, HCSC can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan. The few consumers who do subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high cost of competing against HCSC.

30.     Defendants' anticompetitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in Illinois, have raised the *premiums* that Illinois residents must pay to obtain health insurance.  HCSC's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Illinois market must pay significantly higher rates to health care providers.

31.     The skyrocketing cost of HCSC health insurance coverage in Illinois tells the story of HCSC's abuse of its market and monopoly power at the expense of health care plan consumers in Illinois.  The past year has been no exception.  For example, on August 29, 2012, HCSC hiked premiums up 8.60% for some policies.

## History of the Blue Cross and Blue Shield Plans and of BCBSA

32.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage.  While originally structured as non-profit organizations, since the 1980s these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

33.     The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans.  Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

**Development of the Blue Cross Plans**

34.     In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross

symbol and name as a brand symbol for a health care plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

35.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

36.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

37.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area.  Contrary to the principles that plans would not compete and that plans would not operate in each other's service areas, the independently formed prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each other's territories.  The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . .  Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity

agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

38.     For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the Blue Cross Association, one predecessor to BCBSA.  Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

39.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

**Development of the Blue Shield Plans**

40.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans.  These plans were designed to provide a mechanism for covering the cost of physician care; just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

41.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

42.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting

a term, name, symbol, or product."   In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

43.     By 1975, the Blue Shield plans had a total enrollment of 73 million.

**Creation of the Blue Cross and Blue Shield Association**

44.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.  Cross-on-Cross and Shield-on-Shield competition also flourished.

45.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies.   While the Blues remained dominant in most markets, this growth of competition was a threat.   In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

46.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

47.     Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.  As the former marketing chief of the National

Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

48.     To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

49.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

50.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

51.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

52.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

14

53.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.  However, the goals did not end competition between Blue plans.  In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

54.     During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

55.     In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities.  As a result, many member plans converted to for-profit status.  One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures.  Others attempted to convert to for-profit status but failed.  However, while nominally still characterized as not-for-profit, HCSC and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

56.     From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year.  At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors

15

agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

57.     Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

58.     At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

**Allegations Demonstrating Control of BCBSA By Member Plans**

59.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

60.     BCBSA is entirely controlled by its member Blue plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.  On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

61.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the

16

individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

62.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.  In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.  Raymond F. McCaskey, the current CEO and President of HCSC, serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually, including from November 3-4, 2010 in Chicago, IL.

<u>License Agreements and Restraints on Competition</u>

63.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

64.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

65.     The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey.  According to a brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License

17

Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

66.     The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."   In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."   The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

67.     Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."   The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

68.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   In addition, the Guidelines state that "BCBSA shall send a triennial

membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

69.     The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

70.     The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**Horizontal Agreements**

71.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.   As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

72.     Each BCBSA licensee is an independent legal organization.   In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."   In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

73.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.   The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee.   According to Standard & Poor's, HCSC is "the fourth-largest insurer in the U.S. in terms of membership."   Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.   On its website, BCBSA asserts that its members together provide "coverage for more than 98 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer."   Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

74.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."   The authors of *The Blues: A History of the Blue Cross and*

*Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year.  Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

75.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

### The Horizontal Agreements Not To Compete In The Licensing Arrangements Between BCBSA And Its Member Plans, Including HCSC, Are *Per Se* Violations Of The Sherman Act

76.     The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements

between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a *per se* violation of Section 1 of the Sherman Act.

77.     Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

78.     Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of a Blue plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

79.     Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be

22

substituted for annual revenue, making the alternative restriction that a Blue plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

80.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

81.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

23

82.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

83.     More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions.  For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

84.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to publicly describe the restrictions on its ability to do business. Thus, in its most recent Form 10-K for the year 2012, WellPoint stated that it had "no right to market products and services using the Blue Cross and Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross and Blue Shield products," and that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross and Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue, as defined by the BCSA, attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks."

85.     Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and

24

at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

86.     Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.  When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license.  However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

87.     The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 22, 2013 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through

December 31, 2012, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield license in the vacated service area."

88.     In sum, a terminated licensee would (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area.  These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

89.     It is unsurprising, then, that member plans do not operate outside of their Service Areas.  Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in Illinois but for the territorial restrictions, at present there are no Blue plans other than HCSC, and no non-Blue affiliates of any Blue plans, competing effectively in the commercial health insurance market in Illinois.  The territorial restrictions have therefore barred meaningful competition by all of the Blue plans (other than HCSC) and all of their non-Blue branded business lines from the Illinois commercial health insurance market.

90.     Even in the relatively rare instance in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate.  The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California.  In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent.  In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its

Blue-licensed subsidiaries.  By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them.  This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas.  During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent.  Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire BlueCross BlueShield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period.  In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).  Wellpoint attempted to gain blocks of individual and group commercial business in Illinois through its non-blue UniCare brand, but after gaining only a "relatively small share of the market," it pulled out of the commercial health insurance market in Illinois and reached an agreement for HCSC to assume coverage for its former members.

91.    In another example, as of 2010, a Pennsylvania Blue plan, Independence Blue Cross, had 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and had close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, had an enrollment of only

approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

92.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue plan into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements**

93.     In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which HCSC and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

94.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."  Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

95.     Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired).  These include four situations in which a

28

member plan's license will terminate *automatically*:  (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

96.    These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business.  In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.  Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may often be the most cost-effective due to historical tax breaks,

favorable legislation, and long-term presence in a region.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

97.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

98.     By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is less competition and higher premium costs for consumers, including enrollees of HCSC.

### The BCBSA Licensing Agreements
### Have Reduced Competition In Illinois

99.     HCSC, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.  Many of the member plans with which HCSC has conspired would otherwise be significant competitors of HCSC in Illinois.

100.    For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees.  It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City

metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. Wellpoint attempted to enter the Illinois market through its non-Blue UniCare plans, but quickly gave up and transferred its Illinois policyholders to HCSC. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Illinois in competition with HCSC. Such competition would result in lower health care costs and premiums paid by HCSC enrollees.

101.    Blue Cross and Blue Shield of Michigan is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan.  But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Michigan would be likely to offer its health insurance services and products in Illinois in competition with HCSC.  Such competition would result in lower health care costs and premiums paid by HCSC enrollees.

102.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees.  Its affiliated Blue plans include Highmark Blue Cross Blue Shield in Western Pennsylvania, Highmark Blue Shield throughout the entire state of Pennsylvania, Highmark Blue Cross Blue Shield of West Virginia, and Highmark Blue Cross Blue Shield of Delaware.  But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health insurance services and products in Illinois in competition with HCSC.  Such competition would result in lower health care costs and premiums paid by HCSC enrollees.

103.    In addition to the foregoing examples, there are dozens of other companies offering Blue plans that would and could compete in Illinois but for the illegal territorial restrictions.  As alleged above, fifteen of the twenty-five largest health insurance companies in

the country are Blue plans:  if all of these companies, together with all other BCBSA members, were able to compete in Illinois, the result would be lower costs and thus lower premiums paid by HCSC enrollees.

### HCSC Market Power In Relevant Illinois Markets

104.    HCSC has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Illinois.

### Relevant Product Market:

105.    The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

106.    To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product.  The characteristics of different products are important factors in determining their substitutability.   For a health insurance product, important characteristics include:

107.    Commercial versus government health insurance:   Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent.   Therefore, commercial health insurance and government health insurance programs are not substitutes.

108.    Full-service versus single-service health insurance:  *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers.  In contrast, *single-service* health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care.  Single-service

health insurance is sold as a complement to full-service health insurance when the latter excludes from coverage a specific type of health care, *e.g.*, dental care. Thus, full-service health insurance and single-service health insurance are not substitutes.

109.    Full-service commercial health insurance includes *HMO* products and *PPO* products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers. Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors. Economic research suggests that HMO and PPO health insurance products *are* substitutes.

110.    <u>Fully-insured health insurance versus ASO products</u>:   When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, e.g., processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, ASO products are not true substitutes for fully-insured health insurance products because they are not really insurance and are generally purchased only by

those businesses that are able to *self*-insure, *i.e.*, able to cover their own medical costs and bear the risk that claims will exceed their anticipated losses.

111.   <u>Individual, small group, and large group consumers</u>:   Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums.   Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.   The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

112.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market.   In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.   Across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.   Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

**<u>Relevant Geographic Markets:</u>**

113.   In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network.   An insurer's provider network is composed of the health care providers with which it contracts.   Enrollees in both

34

HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider.  As a result, health insurance consumers pay special attention *to an insu*rer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers.  This suggests that health insurers compete in distinct geographic markets.

114.    There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Illinois.  The potentially relevant geographic markets could be defined alternatively as (a) Illinois, HCSC's service area; and (b) the 145 regions, known as "Metropolitan Statistical Areas," "Micropolitan Statistical Areas," and counties, into which the U.S. Office of Management and Budget divides Illinois.  However the geographic market is defined, the result is the same: HCSC has the dominant market position, and exercises market power.

115.    HCSC does business throughout the state of Illinois, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Illinois, and has agreed with the other member plans of BCBSA that only HCSC will do business in Illinois under the Blue brand.  Therefore, the state of Illinois can be analyzed as a relevant geographic market within which to assess the effects of HCSC's anticompetitive conduct.  As of 2012, HCSC held at least a 55 percent share of the relevant product market in Illinois.

116.    The U.S. Office of Management and Budget divides the 102 counties of Illinois into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and

social integration with that core." Therefore, each of Illinois's 12 Metropolitan Statistical Areas,[1] 23 Micropolitan Statistical Areas,[2] and the 37 remaining counties that are not part of any Metropolitan or Micropolitan Statistical Area[3] is a relevant geographic market within which to assess the effects of HCSC's anticompetitive conduct.  As of 2012, HCSC held at least the following shares of the relevant product market in these Metropolitan Statistical Areas within the state:

| | |
|---|---|
| Bloomington-Normal, IL | 47% |
| Chicago-Naperville-Joliet, IL | 63% |
| Decatur, IL | 57% |
| Kankakee-Bradley, IL | 48% |
| Rockford, IL | 58% |
| Springfield, IL | 36% |

117.   Currently, there is no publicly available data that would enable Plaintiffs to calculate HCSC's share of the relevant product market in each of the remaining Metropolitan Statistical Areas, Micropolitan Statistical Areas of Illinois and each of the Illinois counties that are not part of an MSA.  However, HCSC is able to provide this information.

---

[1] Illinois' Metropolitan Statistical Areas include:  Bloomington-Normal; Champaign-Urbana; Chicago-Naperville-Joliet; Decatur; Kankakee-Bradley; Rockford; Springfield; Peoria; St. Louis, MO-IL; Davenport-Moline-Rock Island, IA-IL; Danville; and Cape Girardeau-Jackson, MO-IL.
[2] Illinois' Micropolitan Statistical Areas include: Burlington, IA-IL; Canton; Carbondale; Centralia; Charleston-Mattoon; Dixon; Effingham; Freeport; Galesburg; Harrisburg; Jacksonville; Lincoln; Macomb; Marion-Herrin; Mount Vernon; Ottawa-Streator; Paducah, KY-IL; Pontiac; Quincy, IL-MO; Rochelle; Sterling; and Taylorville.
[3] Illinois counties that are not within either a Metropolitan or Micropolitan Statistical Area are:  Franklin; Randolph; Montgomery; Iroquois; Jo Daviess; Perry; Shelby; Fayette; Crawford; Douglas; Hancock; Edgar; Union; Lawrence; Wayne; DeWitt; Pike; Richland; Clark; Carroll; Moultrie; White; Washington; Mason; Greene; Clay; Cass; Johnson; Wabash; Jasper; Schuyler; Brown; Edwards; Pulaski; Gallatin; Pope; and Hardin counties.

118.    HCSC's powerful market share is far from the only evidence of its market power. As alleged below, HCSC's market power has significantly raised costs, resulting in skyrocketing premiums for HCSC enrollees.

**Inflated Premiums Charged By HCSC**

119.    From August 21, 2008 to the present, HCSC's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Illinois, leading to artificially inflated and supra-competitive premiums for individuals and small groups purchasing HCSC's full-service commercial health insurance in the relevant geographic markets.  HCSC's market power and its use of anticompetitive practices in Illinois have reduced the amount of competition in the market and ensured that HCSC's few competitors face higher costs than HCSC does. Without competition, and with the ability to increase premiums without losing customers, HCSC faces little pressure to keep costs low.

120.    Over the past decade, HCSC has generally raised individual and small group premiums by substantial amounts. For example, on August 29, 2012, HCSC hiked premiums up 8.60% for some policies.  These rising premiums have enabled HCSC to lavishly compensate its executives as described above and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  In 2012, HCSC had over $20 billion in revenues and a net income of over $1 billion, which led to an overall surplus of $9.6 billion.

## VIOLATIONS ALLEGED

### Count One
### (Contract, Combination, or Conspiracy in Restraint of Trade
### in Violation of Sherman Act, Section 1)

121.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

122.    The License Agreements, Membership Standards, and Guidelines agreed to by HCSC and BCBSA represent horizontal agreements entered into between HCSC and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

123.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and HCSC represents a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act.

124.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and HCSC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including HCSC) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

125.    The market allocation agreements entered into among HCSC and the thirty-seven other BCBSA members (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

126.    HCSC has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

127.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

38

    a.   Reducing the number of health insurance companies competing with HCSC throughout Illinois;

    b.   Unreasonably limiting the entry of competitor health insurance companies into Illinois;

    c.   Allowing HCSC to maintain and enlarge its market power throughout Illinois;

    d.   Allowing HCSC to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts; and

    e.   Depriving consumers of health insurance of the benefits of free and open competition.

128.    The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

129.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

130.    As a direct and proximate result of HCSC's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Illinois Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to HCSC than they would have paid with increased competition and but for the Sherman Act violations.

131.    Plaintiffs and the Illinois Class seek money damages and appropriate injunctive relief from HCSC and BCBSA for their violations of Section 1 of the Sherman Act.

### Count Two
**(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)**

132.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

133.    HCSC has monopoly power in the individual and small group full-service commercial health insurance market in Illinois.  This monopoly power is evidenced by, among other things, HCSC's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

134.    HCSC has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

135.    HCSC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

136.    As a direct and proximate result of HCSC's continuing violations of Section 2 of the Sherman Act, Plaintiffs and other members of the Illinois Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to HCSC than they would have paid but for the Sherman Act violations.

137.    Plaintiffs and the Illinois Class seek money damages from HCSC for its violations of Section 2 of the Sherman Act.

### Count Three
**(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)**

138.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

139.    HCSC has acted with the specific intent to monopolize the relevant markets.

140.    There was and is a dangerous possibility that HCSC will succeed in its attempt to monopolize the relevant markets because HCSC controls a large percentage of those markets

already, and further success by HCSC in excluding competitors from those markets will confer a monopoly on HCSC in violation of Section 2 of the Sherman Act.

141.    HCSC's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Illinois Class.  Premiums charged by HCSC have been higher than they would have been in a competitive market.

142.    Plaintiffs and the Illinois Class have been damaged as the result of HCSC's attempted monopolization of the relevant markets.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.    Adjudge and decree that BCBSA and HCSC have violated both Section 1 and Section 2 of the Sherman Act;

c.    Award Plaintiffs and the Illinois Class damages in the form of three times the amount by which premiums charged by HCSC have been artificially inflated above their competitive levels during the Class Period;

d.    Permanently enjoin BCBSA and HCSC from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

e.    Award costs and attorneys' fees to Plaintiffs;

f.    Provide a trial by jury; and

g.    Award any such other and further relief as may be just and proper.

DATED:  June 7, 2013

Respectfully submitted,


/s/ Charles R. Watkins
One of the attorneys for the Plaintiffs

Brent Hazzard (MSB # 99721)
HAZZARD LAW, LLC
P.O. Box 24382
Jackson, MS 39225
Tel.   601.977.5253
Fax.  601.977.5236
brenthazzard@yahoo.com

David J. Guin (ASB-3461-G67D)
Tammy M. Stokes (ASB-6084-K69T)
GUIN, STOKES & EVANS, LLC
505 20th Street North, Suite 1000
Birmingham, Alabama 35203
Tel.      205.226.2282
Fax.      205.226.2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
300 South Wacker Drive, Suite 1700A
Chicago, IL 60606
Tel.      312.878.8391
charlesw@gseattorneys.com

James K Jenks III
Attorney at Law
8933 W Cermak Rd
North Riverside, IL 60546
Tel.      708.447.8100
jjenkslaw@gmail.com

## SERVICE BY CERTIFIED MAIL

Plaintiffs will serve the Defendants the foregoing by Certified Mail at the following addresses:

HEALTH CARE SERVICE CORPORATION
*dba* BLUE CROSS AND BLUE SHIELD OF ILLINOIS
801 Adlai Stevenson Drive
Springfield, IL  62703

BLUE CROSS AND BLUE SHIELD ASSOCIATION
c/o Roger G. Wilson, Registered Agent
225 N. Michigan Avenue
Chicago, IL  60601